## SANIB CORPORATION v. UNITED FRUIT CO.

District Court, S. D. New York.
Feb. 3, 1947.

Hill, Rivkins & Middleton, of New York City (Arthur O. Louis and James M. Hastie, both of New York City, of counsel), for libelant.

W. Dale Williams, of New York City, for respondent.

KENNEDY, District Judge.

The libel in this cause is in personam. The claim is that respondent, a common carrier, received from libelant on or about July 22nd, 1942, a shipment of 555 bags of banana powder to be transported from Puerto Cortes, Honduras, to the port of Tampa, Florida. It is alleged that the cargo was damaged by water beyond any possibility of salvage. In the same shipment there were also 157 wooden cases of dried bananas belonging to libelant, concerning which no claim is made.

The defense, according to respondent's brief, is that the damage was caused (1) by an inherent quality and vice of the goods and (2) because of insufficiency of packing and containers.

Questions of the burden of proof are not, under the peculiar and uncontroverted facts of this case, as important as they might otherwise be: there is no doubt that here the burden was cast upon the respondent to bring the loss within one of the excepted causes in the statute, Carriage of Goods by Sea Act, § 4, 46 U.S. C.A. § 1304.

The banana powder, which is the subject of the claim, was manufactured in libelant's factory at Puerto Cortes between June 30th, 1942 and July 18th, 1942. Immediately after manufacture, this powder was packed in sealed paper lined bags and stored in an air conditioned room in the factory, protected from the elements. On July 21st, 1942, at the instructions of respondent, the powder was forwarded to respondent's wharf, which is between 1½ and 2 kilometers from libelant's factory. It was laden into S. S. Howard on July 24th, 1942. At no time between July 21st and July 31st, 1942, did the temperature at Puerto Cortes exceed 94 degrees (the significance of this fact will appear later). At no time prior to lading into the Howard was the cargo exposed to the action of water or steam. Respondent's evidence, it is true, is to the effect that the powder was hard when first handled by its employees (July 24th, 1942), and when taken aboard S. S. Howard. The bill of lading issued by respondent contains, concerning the powder, an endorsement "Contents of all sacks hardened". This bill purports to be issued on July 25th, 1942. But other facts in the case diminish the importance which might otherwise be

given to respondent's claim about the condition of the cargo when it was stowed aboard S. S. Howard.

The banana powder was stowed in the after end of the upper tween deck. Along the overhead of that tween deck is a steam line running from the engine room to the steering engine room, a line which supplies steam to the steering gear. On at least three occasions after taking the libelant's cargo on board, S. S. Howard was shifted either from her berth to her anchorage or back again, and on each occasion it was necessary to have steam on the line in question. At some time not clearly disclosed, but during the shifting operations, it was discovered that one of the flanges in the steam line was leaking. This flange was directly over the point where the banana powder was stowed.

On August 6th, 1942, it was found necessary to transship the cargo then on board S. S. Howard. The ship last mentioned is a coal burner, and either because of orders of the naval routing officer as a security measure, or because the stability of the ship was threatened (it makes no difference which), the cargo of S. S. Howard was on August 7th, 1942, transferred to S. S. Sinaloa. Then it was discovered, apparently for the first time, that libelant's cargo had been extensively damaged by water and steam, caused by the leaky steam line. Libelant's resident manager was notified, and, according to his version of the incident, he told respondent's people that the banana powder had become "spongy" (plastic) and had deteriorated beyond any possibility of salvage. Nevertheless, the cargo was again transferred this time into S. S. Gansfjord (on August 13th, 1942). It arrived in Tampa, Florida, on or about August 27th, 1942. It was then forwarded to libelant over the Seaboard Airline Railway to pier 28, North River, New York, arriving at the latter point on or about September 14th, 1942.

Surveyors representing both parties to the litigation examined the cargo at New York. No one apparently even suggested that it was possible to salvage any portion of it. Two sacks of the powder had somehow disappeared between Puerto Cortes and Tampa. Five sacks were sent to General Desserts Corporation for analysis and report, and five were delivered to the respondent's surveyor for analysis. Thereafter 543 bags were destroyed under the supervision of a customs guard.

With the possible exception of the incidents at New York bearing on the possibility of salvage, nothing that happened after August 6th, 1942, has any very strong influence on the questions to be decided. There is no dispute that banana powder has a tendency to harden when the temperature rises above 96 degrees. But when that happens, the powder can easily be restored to its former condition. However, when cargo of this character is subjected to the action of water or steam, it becomes spongy, or gummy, or plastic, as distinguished from becoming merely hard. When this happens, the powder is beyond salvage for any purpose. And respondent admits, through its resident agent at Puerto Cortes, that on August 6th, 1942, some 50 sacks of the banana powder showed signs of having been damaged by water. Libelant's resident manager, after viewing the cargo at the same port, says unequivocally that all of the sacks were undoubtedly in the same ruined condition, having been stowed in a hold where they were subjected to the action not only of water but of live steam. This is a case, therefore, where clearly the cargo came by at least some of its damage after having been taken in the ship. Therefore, the burden is upon the respondent (The Vizcaya, D.C., E.D.Pa., 1945, 63 F.Supp. 898) to absolve itself from fault, and to bring itself within the causes excepted in the statute, and upon which it relies. Carriage of Goods by Sea Act, § 4(2)(i, m, n, p, q), 46 U.S.C.A. § 1304 (2), (i, m, n, p, q). And even if it could be found that there were concurring proximate causes of the damage, only one of which was attributable to the respondent, the burden would be upon the latter to distinguish between the damage caused by its fault and that which was not. Schnell v. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. All we know on this score is that upon the arrival of the cargo in New York a great quantity of the cargo was found to be gummy and beyond sal-

vage. Respondent's surveyor then at least acquiesced in this position, and in the destruction of all of the banana powder that arrived here.

■ Under the rule of The Vallescura, supra, it seems clear to me that respondent must bear the whole loss. Its own expert, testifying at the trial, distinguished between a situation where powder is hardened through the action of temperature (the most favorable view of respondent's case) and one in which other intervening causes, like water and steam, have played a part. He said quite plainly that in the former case salvage was quite possible, and, in fact, that the arrival of shipments of banana powder in such condition is quite common. Yet, all of the cargo was, with his knowledge, treated as valueless at New York. And respondent produced no dependable evidence that at any earlier stage of the voyage (i. e., between August 6th, 1942, and September 14th, 1942) the water and steam damage, for which it was responsible, was limited in its effect to any particular portion of the cargo. True enough, there is evidence adduced on respondent's behalf, to the effect that only some 50 sacks bore external evidence of being damp. But this does not negative the strong possibility that the contents of sacks not visibly wet could still have been destroyed by steam, a possibility which is converted into a probability by the condition of the cargo and the measures taken upon its arrival at New York, at least absent any showing of an independent intervening cause for which respondent was not liable.

■■ I say that the liability for at least part of the damage is clearly traceable to respondent. Considered in one aspect, a leaky steam line in cargo space obviously constitutes unseaworthiness and, although the mate of S. S. Howard was called, there was not the slightest effort to demonstrate due diligence to make seaworthy. In another aspect, it was negligence on the part of the respondent to stow cargo like banana powder in space where it was subjected to the known hazards that a leaky steam line would produce, at least unless it was impossible to prevent the leak by the exercise of due care.

For the rest, while respondent raised some question about the suitability of the containers used by libelant, the evidence fairly analyzed shows that respondent was really urging that no container known is completely temperature and moisture proof. Libelant in this case used containers as well suited to protect the powder as any that can be found.

Libelant urges that respondent was stripped of any protection given by the Carriage of Goods by Sea Act, or by its own bill of lading, because of the transshipment of the cargo at Puerto Cortes which, says libelant, was a deviation. It will be remembered that the banana powder was taken into S. S. Howard on June 24th, 1942, was transferred to S. S. Sinaloa on August 7th, 1942, and was again transferred into S. S. Gansfjord on August 13th, 1942. Respondent's explanation of this series of events is somewhat hazy, but it does suggest that the voyage of the Howard was abandoned by reason of something in the nature of force majeure, namely, the orders of the naval routing officer. Considering the case as a whole, I feel it unnecessary to pass upon the deviation point, although I suppose that, under the circumstances, if the evidence leaves me in doubt, I should resolve that doubt against the respondent.

■ The bill of lading issued by respondent contains a provision that, unless the shipper sets a higher value in the bill of lading itself, then the value of the goods is not to exceed $100 per package, and no value is to be placed upon it higher than the invoice cost. Respondent argues that this is not a limitation of liability, but an agreed value, permissible under The Ferncliff, 1939, 306 U.S. 444, 59 S.Ct. 615, 83 L.Ed. 862. But that case was decided prior to the enactment of the Carriage of Goods by Sea Act. And I think that the decision of the question is controlled by Pan-Am. Trade & Credit Corp. v. The Campfire, 2 Cir., 1946, 156 F.2d 603. The provision is a limitation, invalid because in contravention of the statute.

■ If I am right in all this, then the damage for which respondent is answerable is, subject to the limitations of the Car-

riage of Goods by Sea Act, the market value of the cargo at the port to which it was consigned. There is no market for banana powder in bulk at Tampa, Florida. There is, however, evidence upon which a finding can be based that in September 1942 the sound market value of bulk banana powder at the port of New York landed in bags was 28¼¢ per pound. Freight from Tampa to New York, which I think should be deducted, is at the rate of 2¢ per pound. The 555 bags originally shipped aggregated 24,975 pounds, which, at the reconstructed market value at New York, would mean a loss to libelant of $6,555.94. There were incidental charges borne by libelant for warehousing, trucking, services of customs guards, and duty paid on bags for examination aggregating $108.77. All of these incidental charges were reasonable in amount and were necessarily paid because of respondent's negligence. Since the record is so clear, at least to me, I have not followed the usual course of sending the damage question to a commissioner.

Libelant is entitled to a decree in the amount of $6,664.71 together with costs.

I have filed findings of fact and conclusions of law.