**CALIFORNIA AND HAWAIIAN SUGAR REFINING CORPORATION, Ltd., Plaintiff,**

v.

**WINCO TANKERS, INC. and the SS WINDSOR VICTORY, her engines, tackle, boiler, etc., Defendants.**

No. 6788.

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 9, 1968.

As Amended Jan. 24, 1968.

J. Barbee Winston, James Roussel, George W. Healy, III, New Orleans, La., for plaintiff.

Alfred M. Farrell, Jr., New Orleans, La., for defendants.

RUBIN, District Judge:

A cargo of bulk sugar carried aboard the SS WINDSOR VICTORY from Hawaiian ports in 1964 was damaged during the voyage by water leaking from a drainpipe that carried waste from the galley through the No. 4 hold of the vessel to a discharge valve. The narrow issue upon which decision turns is whether the carrier is responsible for the damage on the basis that it was caused by want of due diligence on its part to make the ship seaworthy.

The WINDSOR VICTORY sailed from Calcutta to the Hawaiian Islands to take on cargo. On the voyage, the ship's holds were cleaned, inspected and prepared to receive bulk sugar. After the WINDSOR VICTORY sailed from Hawaii on July 21, 1964, rough seas were encountered. On July 21, the vessel pitched heavily on rough seas. That night she pitched moderately. The next two days brought moderate seas and

swells, followed by two days of confused swells. Regular soundings of the deep tanks were taken, and on July 27 water was found in the port forward deck tank of the No. 4 hold. Pumps were started but the daily soundings in the No. 4 port bilge continued to increase. The master and chief engineer took the tarpaulins off the hatch to see what could be done but, since all spaces below were filled with cargo, the hold was inaccessible.

However, as the water reduced the sugar to molasses, the bulk of the cargo was reduced, and, after several days, it became possible to get into No. 4 lower hold. The chief engineer crawled through the wet sugar, found the hole in the galley drain line, and put a temporary patch on it.

After the ship docked in New Orleans and cargo was discharged, it was found that about 1,000 tons of sugar had been damaged, and the defendant's surveyor reported that the loss amounted to $29,655.48.

■ The case is controlled by the Carriage of Goods by Sea Act of 1936, 46 U.S.C. § 1300 et seq. (COGSA). Section 3 of the Act (46 U.S.C. § 1303) sets out the absolute, affirmative, and non-delegable duties [1] of the carrier. The carrier is bound "before and at the beginning of the voyage, to exercise due diligence to—(a) Make the ship seaworthy * * * [and] (c) Make the holds * * * and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation."

In addition to imposing duties, the COGSA provides exemptions from liability. Section 4 (46 U.S.C. § 1304) relieves the carrier and the ship from liability "for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and * * * to make the holds * * * and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation * * *." It then states expressly what might otherwise be implied, "Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier * * *."

While the defendant contends the ship was seaworthy at the start of the voyage, it admits that, when an inside drain pipe leaks, the vessel becomes unseaworthy. It requires, then, a more detailed examination of the facts to determine whether the carrier has borne its burden of proving that it did exercise due diligence to make the ship seaworthy. The facts, as I find them, are:

The SS WINDSOR VICTORY was built in 1945 to the standard Victory-ship type specifications. After a period of service, it was placed in the lay-up fleet in Mobile. When the defendant decided to acquire a Victory-type vessel, it inspected a number of them and picked this one as being in the best condition. The WINDSOR VICTORY was therefore reactivated, repairs and renewals were completed and the defendant acquired it on February 8, 1963. On that date, the American Bureau of Shipping surveyed the vessel and found her seaworthy.

The defendant stresses the thoroughness of the repairs and tests, mentioning the fact that there were 302 separate items described in detail on the "reactivation and general repairs specification" and quotes illustrative and pertinent paragraphs. But there is no mention in the specifications of any particular type of test on the piping, although there is a reference to testing the drains "to the satisfaction of A.B.S. and Owner's representatives." There was testimony that the galley drain pipe was filled with water and tested for leaks and later hammer tested by the Owner's independent port engineer.

1. The Otho, S.D.N.Y., 1943, 49 F.Supp. 945, aff'd 2 Cir., Huilever, S. A. Div. Huileries Du Congo Belge v. The Otho, 139 F.2d 748; Standard Oil Co. (N.J.) v. Anglo-Mexican Petroleum Corp., S.D.N.Y., 1953, 112 F.Supp. 630.

The WINDSOR VICTORY was placed in service, in bulk cargo carriage, and went to sea for 17 months. She was surveyed on October 31, 1963, in connection with minor damage not related to the present litigation, and had an annual classification survey on January 15, 1964. No mention is made in the reports of these surveys of any special examination or test of the piping.

After several voyages, the WINDSOR VICTORY sailed to Calcutta, discharged cargo, and, on June 13, 1964, sailed in a lightened state for Hawaii to begin the voyage involved in this litigation under the standard form of bulk sugar charter. The owner warranted the vessel to be "tight, staunch, strong and in every way fitted for the voyage so far as the exercise of due diligence can make her so." The charter party adopted the COGSA contractually, but in any event the COGSA would have applied.[2]

On the voyage to Hawaii, the holds were cleaned and inspected. A wooden floor was built over the bottom of the lower No. 4 hold. The master made several trips to the lower No. 4 hold and visually inspected the bulkheads to be sure they were clean and dry.

The galley drain pipe in which the leak occurred runs from the 30 gallon sink, located above the No. 4 'tween deck, down the port skin of the ship, through the 'tween deck and into the lower hold. About 9 feet above the deck of the lower hold, the drain pipe turns into the skin of the ship. The lower end of the pipe is equipped with an overboard discharge valve. This is a clapper or swing-type check valve designed to permit waste water out of the line but to close against the sea water outside the line. It is not completely tight against sea-water, however, and there is usually some contamination by salt water inside the line when the vessel is loaded and the valve is below water level.

The pipe appeared to be in good condition. It had been painted with aluminum paint and this looked relatively bright and fresh. However, it was made of galvanized steel, presumably because the vessel was built under war-time conditions, rather than of copper or lead, which are preferable materials in normal circumstances.

The testimony of the vessel's chief engineer, Mr. Barber, was taken by deposition. He testified that, about a week before the bulk sugar cargo was loaded, he went into the lower hold to check on the construction of the wooden flooring. He went to the clapper valve of the galley drain pipe, looked it over, "flaked" the gasket, that is, tested it with his finger, found the gasket brittle, and later changed it. He said the Third Engineer, whose name was Cox, assisted him, but Cox did not testify. The Chief Engineer said he was working only about 18 inches from the point where the leak later occurred, and saw no signs of leak. He said the place where the pipe later leaked was "right in front of [his] face" when he was working. I find it difficult, however, to credit this testimony. The owner's other evidence indicated the gasket that was replaced was made of rubber, had been inserted new when the vessel was reconditioned, and would normally last more than seventeen months. The gasket was against the skin of the ship nine feet above the deck's floor, and it is passing strange that the Chief Engineer happened to flake it with his fingers in passing when the other testimony was that it was so high that it was necessary to work on a ladder to replace it. Nor does it escape notice that it would be unusual for the Chief Engineer himself to undertake to replace a gasket on a ladder in the hold.

When the vessel arrived at Hawaii on July 18, there was a condition survey of the cargo spaces for the joint account of the charterer and owner. Although the surveyor was inspecting for the purpose of noting any damage to the vessel that existed before loading so that these could not be charged to the charterer, he did not inspect the piping but he did

2. 46 U.S.C. § 1312.

**652**

check the shell frames and pipe guards in the lower No. 4 hold and noted no evidence of leakage or water damage.

On completion of discharge by the vessel in New Orleans, the galley drain pipe was removed, tested, surveyed, and sonically gauged for thickness. Later a metallurgical examination was made. As a result of the expert testimony and my own examination of the pipe, I find that it had gradually become corroded from the inside. The corrosion occurred slowly but the breakthrough was sudden, and it had not yet happened when the vessel was loaded. The weakened area broke through during the voyage, however, perhaps as a result of vibration of the vessel or a surge of water. The corrosion was not apparent on visual inspection since the surface paint was still in place but it would have been discovered by a hammer test or hydrostatic pressure test.

## SEAWORTHINESS

Seaworthiness is reasonable fitness of the vessel to carry the cargo that she has undertaken to transport. The Silvia, 1898, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; Martin v. The Southwark, 1903, 191 U.S. 1, 24 S.Ct. 1, 48 L. Ed. 65; R. T. Jones Lbr. Co. v. Roen S.S. Co., 2 Cir., 1959, 270 F.2d 456. It is determined at the time the voyage begins. The Caledonia, 1895, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; May v. Hamburg-Amerikanische, etc., 1935, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348; Isbrandtsen Co. v. Federal Insurance Co., D.C. N.Y., 1952, 113 F.Supp. 357; Interlake Iron Corp. v. Gartland S.S. Co., 6 Cir., 1941, 121 F.2d 267, cert. denied, 314 U.S. 681, 62 S.Ct. 181, 86 L.Ed. 545.

When the WINDSOR VICTORY sailed, the galley drain pipe had so far corroded that only the accumulated rust and scale held the paint in place. While there was no visible break in the paint and consequently no actual hole in the pipe, the development of a hole and the consequent leak of water into the sugar within a short time was inevitable. The metallurgical expert who testified said the pipe was not sound and hadn't been for many years. The ship was then unseaworthy. True the owner did not know of its unseaworthiness. But unfit she was to carry sugar, and the manifestation of this unseaworthiness soon appeared.

That the defect was not then discovered is not conclusive; in fact the vessel was not reasonably fit to carry her cargo. See The Bill, D.C.Md., 1942, 47 F.Supp. 969, aff'd 145 F.2d 470; Imperial Sugar Co. v. Bright Star S.S. Co., S.D.Tex., 1950, 92 F.Supp. 693. Indeed it has been held that "proof that sea water entered the cargo tanks raises a presumption of 'unseaworthiness' which the vessel * * * must rebut by producing clear proof that the loss and damage did *not* result from failure to exercise due diligence to make the vessel seaworthy in fact, and that it *did* result from a peril of the sea. This heavy burden is not carried if the issue is left in doubt." Artemis Maritime Co., Inc. v. Southeastern Sugar & Molasses Co., Inc., 4 Cir., 1951, 189 F.2d 488, 491. See also The Vizcaya, E.D.Pa., 1945, 63 F.Supp. 898.

## DUE DILIGENCE

Carriers have frequently borne the burden of proving that damage to cargo was not caused by a lack of due diligence and that they were therefore entitled to exoneration under COGSA.[3] The question is always a factual one, to be examined under the detailed circumstances of each particular case.

"Due diligence" is a term of legal art, like those other familiar stand-

---

**3.** Peter Paul Inc. v. Rederi A/B Pulp, 2 Cir., 1958, 258 F.2d 901; The Toledo, 2 Cir., 1941, 122 F.2d 255; The Quarrington Court, 2 Cir., 1941, 122 F.2d 266; The Waterville Victory, et al., S.D.N.Y., 1951 A.M.C. 320, aff'd, per curiam, Continental Ins. Co. v. United States, 2 Cir., 1952, 195 F.2d 527; Sociedad Armadora A.P. v. 5,020 Long Tons of Raw Sugar, E.D. Pa., 1954, 122 F.Supp. 892, aff'd per curiam 3 Cir., 1955, 223 F.2d 417.

ards, the reasonable man, due care, ordinary skill, and a host of others. It is a purposely broad concept, designed to enable the trier of fact to evaluate a variable on the basis of flexible criteria. This enables the trier of fact to take into account community standards, industry custom, human fallibility, and the competing interests of other parties. And so we find "due diligence" defined in familiar terms: it's what a reasonably prudent vessel owner would have done. National Sugar Refining Co. v. MS Las Villas, E.D.La., 1964, 225 F.Supp. 686; The Bill, D.C.Md., 1942, 47 F.Supp. 969, affirmed 4 Cir., 145 F.2d 470. Hence the question is whether a reasonably prudent vessel owner would have considered visual inspection of the galley drain pipe sufficient under the circumstances here presented.

Visual inspection has been held sufficient to discharge the owner's duty where damage was later caused by a break in a nipple on a water carrying pipe; there was no satisfactory evidence as to what caused the break in the nipple; the defect was latent, "not discoverable by investigation measuring fully up to due diligence"; and if the break had been due to a defect, it would have been disclosed immediately because of the frequent use of the toilet to which the pipe ran. The Schoharie, S.D.Ga., 1936, 1937 A.M.C. 610. Where a defect is not apparent upon visual inspection nor discoverable by any reasonable inspection that might have been performed, Judge E. Gordon West has held that the defect is a latent one, "not discoverable by due diligence." National Sugar Refining Co. v. MS Las Villas, E.D.La., 1964, 225 F.Supp. 686.

However, another district court has found that special care to determine the extent of possible corrosion is required to constitute due diligence. The Bill, D.C.Md., 1942, 47 F.Supp. 969, aff'd 4 Cir., 1944, 145 F.2d 470. A distinction is sought to be drawn between the WINDSOR VICTORY and the BILL, on the basis that there the owner failed to provide any evidence that the ship's holds and bilges had been properly cleaned after prior sulphur cargo had been discharged and the court found that in these circumstances the master should have been put on notice of the potential corrosion. But if this is the decisive factor, the master of the WINDSOR VICTORY should have been equally on notice of the danger of corrosion in the galley drain pipe, an area that the evidence makes clear was particularly subject to corrosion because it carried galley wastes and in addition provided an air-seawater interface, that is a point where air and sea water met.

In General Foods Corp. v. Troubador, S.D.N.Y., 1951, 98 F.Supp. 207, coffee was damaged by water from a leak in a sanitary line. The Court there said of a claim that the carrier had exercised due diligence by inspecting the hold, "However the inspection was merely a visual one, and rather a superficial one. The burden of proving due care is not sustained by such an inspection."

Many of the other cases cited are not applicable. Therefore, we put aside such cases as Ore S.S. Corp. v. D/S A/S Hassel, 2 Cir., 1943, 137 F.2d 326. The Court there said that "A mere superficial inspection of a ship is insufficient to establish an exercise of due diligence," but this must be taken in context. A long range visual inspection of rivets, without hammer or drill tests, was held insufficient. And the Archangelos, S.D. N.Y., 1957, 1957 A.M.C. 549, is equally without precedential value here, for the court there found the chief mate had not made an adequate visual inspection: he did not give the pipes in question "either a 'lick or a promise.'" Nor can we be guided by decisions like General Motors Corp. v. The Olancho, S.D.N.Y., 1953, 115 F.Supp. 107, in which the court found there was a warning of a possible defect in a plate resulting from corrosion that was not heeded; or Imperial Sugar Co. v. Bright Star S.S. Co., S.D. Tex., 1950, 92 F.Supp. 693, in which the opinion refers merely to a failure properly to inspect the steamship; or Union Carbide & Carbon Corp. v. The Walter

Raleigh, S.D.N.Y., 1951, 109 F.Supp. 781, aff'd 2 Cir., 1953, 200 F.2d 908, in which the court said of an inspection of valves that the inspection must be "something more than visual * * * valves should be tested under pressure not just looked at when not under pressure." [4]

■ But it is important to observe that, just as in general tort law, doing what is customary does not of itself negate negligence. "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." Texas & Pacific Railway Company v. Behymer, 1903, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905. The usual custom of ship owners is not controlling. The Indrapura, 9 Cir., 1911, 190 F. 711. The standard is not merely what ship owners usually do, but what a reasonably prudent one would do—and not what he might do in another vessel but in this vessel under the particular circumstances here present.

The pipe that leaked was near the top of the No. 4 lower hold and it was obvious that the safety of the bulk sugar cargo in that hold was dependent on the integrity of the pipe. A visual inspection of the pipe while the vessel was light and without cargo, and while the clapper valve and the discharge opening were above the water line, would not fully represent the conditions that would actually be experienced after the vessel was loaded. When the vessel was light and without cargo, the clapper valve and the discharge opening would be above the water line and liquids in the pipe would, as a result of gravity, course through the pipe; there would be no pressure on the liquid to escape through the leak. However, when the WINDSOR VICTORY was loaded as she was on this voyage, the clapper valve and discharge opening would be below the water line; therefore a "head" or segment of water would build up in this line from time to time before the pressure of gravity would be sufficient to open the valve. Thus, the pipe would be subject, after loading of the vessel, to entirely different conditions and stresses than existed when the vessel was visually inspected.

■ Nor can we overlook the fact that the WINDSOR VICTORY was nineteen years old when the voyage occurred and the pipe, while good enough so far as steel pipe went, was steel pipe after all, installed under wartime shortage conditions, and not the type of pipe that the metallurgical expert testified could be recommended. The age of the vessel is a factor that should be taken into account in determining what is due diligence,[5] along with the availability of alternative tests, the nature of the cargo,[6] the conditions of weather and sea reasonably to be anticipated on the voyage [7] and any other factor that "might tend to enlarge or restrict the obligation imposed by the talismanic phrase 'due diligence.' " [8]

■ There were other tests that could have been performed in addition to visual inspection, such as a hammer test or a standing water test, let alone a hydrostatic pressure test. It is true, as defendant argues, that no expert affirmatively testified that these tests should have been made before loading cargo. The defendant says also that there is literally about a mile of pipe in a Victory-type ship and it would be impractical, if not impossible, to hammer test every inch of the pipe. But there was

4. We likewise must of course disregard cases like Sanib Corporation v. United Fruit Co., S.D.N.Y., 1947, 74 F.Supp. 64, 67, in which the court found "There was not the slightest effort to demonstrate due diligence to make seaworthy."

5. See General Foods Corp. v. Troubador, S.D.N.Y., 1951, 98 F.Supp. 207.

6. United Distillers of America v. The T/S Ionian Pioneer, E.D.La., 1955, 130 F. Supp. 647. See also General Foods Corp. v. The Troubador, S.D.N.Y., 1951, 98 F.Supp. 207.

7. United Distillers of America v. The T/S Ionian Pioneer, E.D.La., 1955, 130 F. Supp. 647.

8. Ibid.

only a relatively short length of water-carrying pipes that ran through the cargo holds in such a position that a leak would have caused cargo damage. Nor does the fact that the vessel had been on the high seas carrying a full cargo on its voyage to India without suffering any leaks satisfy the requirement to use due diligence to make the vessel seaworthy before loading another cargo two weeks later. In sum, the burden of proving due diligence was on the vessel, and it was not satisfied by showing a visual inspection, even if adequate tests had been made 17 months earlier.

The Quarrington Court, 2 Cir., 1941, 122 F.2d 266, does not persuade me to the contrary. The Court there mentioned that, "The customary practice with respect to inspecting such pipes is merely to watch for leakage," and found the evidence supported visual inspection as meeting the requirements of due diligence to guard against leakage from a main injection pipe. It mentioned in doing so that the pipe was "of proper design and material; it was only eight or nine years old, which is less than half the normal life of such pipe * * *." Here the pipe was of inferior material and it was nineteen years old, and this is mitigated only slightly if at all by the defendant's emphasis on the fact that the vessel was out of service for four years, for the evidence is that corrosion inside the pipe would have continued during that period.

In The Floridian, 2 Cir., 1936, 83 F.2d 949, the chains of a ship's steering system broke causing a long delay for repairs as a result of which the perishable cargo was damaged. But here, after repairs had been made other tests were performed and " * * * [T]he chains were not only tested for cracks with a hammer, but * * * an actual test of the whole gear was made at the dock. A full head of steam was put on the steering engine and for some time the rudder was put hard over to either side. This put a good strain on the chain and seems to be the most thorough test possible aside from actual use in very bad weather." Nor does the test applied in Floridian as to damage caused by leakage of water apply here, for there was no evidence as to the source of the leak or its cause other than perhaps a defect in reconditioning and, "an inspection of these pipes before sailing had showed them to be watertight. Care had been taken during the reconditioning to see that the old pipes were snugly plugged. There were no grounds for inferring that this part of the reconditioning job was not performed with due diligence."

The conclusion I reach is already apparent. The owner of the WINDSOR VICTORY did not exercise due diligence to make her seaworthy. He is therefore responsible for the loss.

Counsel for the cargo interest will prepare a proposed form of decree and, after submitting it to opposing counsel for approval, submit it to the Clerk.