HOLSATIA SHIPPING CORP., as
Disponent Owner of the M/V
Hugo Oldendorff, Plaintiff,

v.

The FIDELITY AND CASUALTY CO.
OF NEW YORK and Federal Insurance
Company, Defendants.

No. 80 Civ. 1899 (JMC).

United States District Court,
S. D. New York.

March 18, 1982.

Haight, Gardner, Poor & Havens, New York City (Gordon W. Paulsen and Nicholas H. Cobbs, New York City, of counsel), for plaintiff.

Bigham Englar Jones & Houston, New York City (Joseph J. Magrath, 3rd, New York City, of counsel), for defendants.

## OPINION

CANNELLA, District Judge:

After a nonjury trial on the merits of plaintiff's complaint, the Court finds for plaintiff. Pursuant to the stipulation of the parties, this action is referred to Magistrate Washington for a determination of the accuracy of the general average adjustments.

## FACTS

This is an admiralty and maritime claim for contribution in general average over which the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 and Fed. R.Civ.P. 9(h). The defendant cargo insurers refuse to pay the general average assessment on the ground that plaintiff failed to exercise due diligence to make the vessel seaworthy.

The following are the Court's findings of fact: In September 1975, Elder International Export, Inc. ["Elder"] and United States Steel International Inc. ["US Steel"], as shippers, delivered certain cargo to plaintiff at Houston, Texas, for carriage aboard plaintiff's ship, the M/V Hugo Oldendorff.[1] The cargo was to be delivered to the Societe Algerienne de Forage/Alfor at Algiers, pursuant to Bills of Lading Nos. 1, 4 and 5.[2] Defendant Fidelity and Casualty Co. of New York insured the Elder cargo and defendant Federal Insurance Company insured the US Steel cargo.[3] The contracts of insurance obligated each defendant to pay to its insured any loss suffered by incurring liability in general average.[4] Stevedores loaded the cargo on board the vessel on September 24, 1975, and the vessel sailed that evening.[5]

At approximately 7:40 p. m. on September 25th, in the Gulf of Mexico, an explosion occurred in the main engine crankcase and the engine stopped. The vessel drifted at sea for three days while the ship's engineers attempted unsuccessfully to repair the damage. On September 28, a towing line from the tug Jason Smith was secured and the vessel was towed to New Orleans as a port of refuge.[6] The crew determined that the immediate cause of the crankcase explosion was an overheating of the No. 4 bearing and bearing keep between cylinders No. 7 and 8.[7]

At New Orleans, the vessel underwent temporary repairs, but the exact cause of the breakdown was not determined. The vessel resumed her voyage on October 16, 1975, operating at reduced speed, and ar-

---

1. *See* Joint Exhibit 21, ¶ I(4), (5) (Consent Pretrial Order) [hereinafter Joint Exhibits will be referred to as "JX——"].

   Plaintiff, a corporation organized and existing under the laws of the Republic of Liberia, was at all times pertinent to this litigation the disponent owner of the vessel, the registered owner of which is Egon Oldendorff of Lubeck, West Germany.

2. *See* JX 1A; JX 1B; JX 2.

3. *See* JX 21, ʼ. I(4), (5). Defendants are American corporations with offices in New York City. *See id.*, ¶ I(3).

4. *See* JX 21, ʼ I(4), (5).

5. *See* JX 3 at 3; JX 21, ¶ I(7).

6. *See* JX 3 at 3–5; JX 21, ʼ I(8).

7. *See* JX 21, ʼ I(9).

rived at Algiers on November 4.[8] In January 1976, the vessel arrived at Amsterdam for survey and permanent repairs.[9]

The vessel was inspected at Amsterdam by John Mason, a surveyor from the Salvage Association, on behalf of the vessel's hull underwriters.[10] Hans Poehlsen, a superintendent engineer employed by the vessel's owner of record, Egon Oldendorff of Lubeck, West Germany, participated in the inspection.[11] In his inspection, Mason found "scoring and grooving" on all the main crankshaft bearings, "running to approximately 1 mm. deep."[12] Mason and Poehlsen concluded that the nature of the scoring indicated that ferrous material had contaminated the lubricating oil and caused the immediate damage.[13] Mason therefore conducted a thorough inspection of the lubricating oil system, including the pipes, oil filters and two main engine lubricating oil pumps ["lube oil pumps"].[14]

Each lube oil pump consists of two worm gears, or helical spirals, placed one on top of the other and interlocking tightly so that the shafts, or spindles, are separated by a space of no more than .15 millimeters. The top, or drive, shaft is powered by a motor and is connected to the bottom, or idler, shaft through a gear mechanism to ensure synchronization. Because oil passes through the pump from one side and out the other by positive displacement, the pump is self-lubricating.[15]

To maintain proper alignment, each shaft is connected to the pump casing by a ball bearing pressed into the casing. Each bearing is maintained in position along the axis of the spindle by means of a locking nut which threads around the spindle. The threads are extremely fine, enabling a tight fit and minimizing the likelihood of a locking nut coming loose through vibration. When fully threaded, the locking nut is flush with the bearing and keeps the shaft in proper alignment.[16]

Because vibration tends to loosen the locking nut, the nut is normally secured in place by a small set screw, which threads into a hole in the nut and onto the shaft. As a further guard against loosening of the locking nut by vibration, the set screw is designed to be held in place by a spring clip, which is a metal ring that is placed around the nut. One end of the spring clip is bent to fit into the groove on the head of the set screw. The spring clip also prevents a loosened set screw from falling from its hole into the area where the shafts are turning.[17]

Mason and Poehlsen first inspected the pipes and oil filters, but found no defects. Mason then dismantled the two lube oil pumps.[18] He noted the following in his survey report:

> The port side forward oil pump (No. 2) was found to have suffered severe wear as a result of the loosening of a shaft bearing locking nut. This pump was in service at the time of the engine failure. The pump [is] of a helical screw double shaft type, make Houtuin Pompen N.V., Type 1K160/86B [and] has each bearing secured in place by a locking nut. The nut is then secured by an "allen" type

8. *See* JX 3 at 5–12; JX 21, ¶ I(10).

9. *See* JX 21, ¶ I(11).

10. *See* JX 10.

11. *See* JX 10 at 2; JX 22 at 4–5 [hereinafter "Poehlsen Deposition"].

12. JX 10 at 3.

13. Poehlsen Deposition at 6; JX 23 at 5–6 [hereinafter "Mason Deposition"].

14. JX 10 at 3; Poehlsen Deposition at 8; Mason Deposition at 6.

15. *See* JX 10 at 3; JX 12; Poehlsen Deposition at 8–9; Transcript of Trial at 19 (testimony of Norman Jensen) [hereinafter "Tr."].

16. *See* JX 10 at 3; Poehlsen Deposition at 9–11; Mason Deposition at 7–8; Tr. at 20–21.

17. *See* JX 10 at 3; JX 13; JX 14; Poehlsen Deposition at 10–15; Tr. at 21–22.

18. *See* Mason Deposition at 6. Mason and Poehlsen painstakingly examined the engine and the lubricating oil system. It took ten days to dismantle the engine and lube oil system piece by piece until the damage to the No. 2 pump was located. *See* Poehlsen Deposition at 6–8.

screw through the nut onto the shaft. This screw is then held from turning by a spring clip.

On the idler shaft top bearing the securing nut had become loose but no traces of the securing screw or spring clip were found.

The nut had worn deeply into the case iron top cover to a depth of approximately 3 mm., on the shafts the gears had moved and were heavily worn on the tooth edges, the scroll pump sections had been rubbing heavily together such that heavy fretting and break up of the surface material had occurred.

The cast iron pump casing had split between the two shaft ports.

From consideration of the damage found on the engine and pump it was our opinion that a considerable amount of ferrous material from the lubricating oil pump had entered the lubricating oil system. This would be in the form of finely ground particles that would pass the 80 to 100 micron mesh filters of the system. This in turn has caused scoring and grooving of the main engine bearings with the failure of the No. 4 main bearing on the 25th September 1975.

The cracking of the bedplate was considered a result of the overheating of the No. 4 bearing and bearing keep. The bearing keep on this type of engine is fitted without clearance between the side shoulders of the bedplate casting. Expansion of the keep forced the sides of the bedplate apart causing it to split just below the point where pressure from the keep was being applied. This opinion of the expansion of the keep causing the damage was verified by the decreasing pattern of fractures away from this journal.

It being our opinion no fractures as to cause such damage were in existance [sic] in the bedplate or crankshaft prior to the 25th September 1975.[19]

The Hugo Oldendorff was built in 1969 and the No. 2 lube oil pump was among its original equipment.[20] Because the pump was self-lubricating, it generally required no maintenance at all.[21] Indeed, according to Norman Jensen, a marine surveyor and engineer, if the pump was running properly, it would have been imprudent to open it for any reason. To do so would risk jeopardizing the close tolerances of the shafts.[22] It is an accepted practice in the industry to monitor such pumps solely by external examination—by checking outputs and pressures and listening for unusual noises—except when there are indications of some malfunction.[23]

The Hugo Oldendorff was entered with the Germanisscher Lloyd Classification Society ["German Lloyd"], and was inspected in conformance with its requirements. In 1973, the vessel was drydocked at Antwerp for a comprehensive class renewal inspection by German Lloyd.[24] During that inspection, the German Lloyd surveyor, E. Schuerman, certified that the lube oil pumps were operating properly.[25] Whether the surveyor actually dismantled the pumps in 1973 is not clear, although the surveyor would not normally do so.[26] In addition,

---

19. JX 10 at 3–4; see Mason Deposition at 12.

20. See JX 7A (English translation of JX 7); Poehlsen Deposition at 19.

21. See Poehlsen Deposition at 9, 18, 20; Mason Deposition at 12; JX 25 at 8, 12 [hereinafter "Hanselmann Deposition"]; Tr. at 20.

22. See Tr. at 20. See also Poehlsen Deposition at 20. JX 24 at 5 [hereinafter "Vanhoucke Deposition"].

23. See Poehlsen Deposition at 18, 20; Hanselmann Deposition at 8, 12; Vanhoucke Deposition at 5; Tr. at 23–24.

24. See JX 7A (English translation of JX 7).

25. As translated into English, the German Lloyd survey report states in pertinent part: "Was the following equipment * inspected; findings: . . . Lubricating oil: Okay. . . . The equipment comprises the following: pumps . . . ." JX 7A at 5.

26. See Hanselmann Deposition at 13; Vanhoucke Deposition at 4; Tr. at 22–23. When asked what a classification survey would entail, Mason testified:

This depends very much on the individual classification surveyor, but it could be to ap-

according to the shipyard's representative, Francois Vanhoucke, the shipyard's invoices contained no entries for repairs to the No. 2 lube oil pump.[27] Even if the pump was opened, the likelihood is that the surveyor would only check for wear on the shafts and would not look at the set screws on the locking nuts.[28]

Nevertheless, when the engine was inspected at Amsterdam after the breakdown, Poehlsen told Mason that he believed that the pump damage was the result of negligence on the part of the 1973 German Lloyd surveyors in failing to reassemble the pump properly after an overhaul.[29] Mason's observation in his report that "the damage found could well have been caused in the manner put forward"[30] was based entirely on Poehlsen's suggestions about repairers' negligence.[31]

Poehlsen testified that he had attributed the damage to repairers' negligence "because we had to declare the reason for the damage at the pump."[32] Poehlsen also testified that he did not know for certain whether the pump had actually been opened, disassembled or repaired, and that his assertion was a "guess" based solely on the information contained in the German Lloyd survey report.[33] That report states simply that the lubricating oil system had been "inspected" and found to be "okay."[34]

The Hugo Oldendorff underwent an interim survey by German Lloyd in June 1975 at Hamburg. The lubricating oil system was again found to be functioning properly, although there is no indication that the pumps were actually opened.[35] Siegfried Hanselmann, the vessel's chief engineer for the six months prior to the breakdown, also reported that the lube oil pumps ran properly.[36] He testified that the vessel's previous chief engineer told him nothing about the pumps, although he mentioned that he had had no trouble with the ship's machinery.[37] Hanselmann also testified that during the several German Lloyd surveys that he had observed, he had never been asked to open a pump if its external indications were normal.[38]

Pursuant to identical provisions in the bills of lading, plaintiff declared a general average on account of the September 25, 1975 casualty. At plaintiff's request, the Hamburg firm of Werner Schult, Hans Gunter Held prepared a statement of general average, which it published on February 15, 1978.[39] Because the adjustment was computed in Deutsch Marks and purported to be in accordance with the York Antwerp Rules 1974, it did not comply with the terms of the bills of lading.[40] Cargo interests accordingly refused to pay[41] and a revised statement was prepared and published on July 3, 1978.[42] This adjustment was com-

prove the condition of the pump for a further four-years work, and he could have opened up the whole pump for examination for wear or he could have, alternatively, observed the running of the pump, looked at the records of the pump and given survey approval on that. Mason Deposition at 10–11.

27. *See* Vanhoucke Deposition at 4; JX 16.

28. *See* Mason Deposition at 11–12; Vanhoucke Deposition at 6.

29. *See* JX 10 at 4. In a letter written to the general average adjusters in 1978, Poehlsen implicitly suggested repairers' negligence as the cause by referring to the 1973 "overhaul" of the pump by German Lloyd. JX 15.

30. JX 10 at 5.

31. *See* Mason Deposition at 10.

32. Poehlsen Deposition at 14.

33. *See* Poehlsen Deposition at 15–16.

34. JX 7A at 5. *See also* note 27 *supra* and accompanying text.

35. *See* JX 8; JX 9.

36. *See* Hanselmann Deposition at 10–12; JX 20.

37. *See* Hanselmann Deposition at 12.

38. *See* Hanselmann Deposition at 13.

39. JX 3.

40. JX 1A; JX 1B; JX 2.

41. *See* JX 21, ⸢ I(13), (14).

42. JX 4.

puted in United States dollars and purported to be in accordance with the York Antwerp Rules 1950. Defendants still refused to pay, on the ground that plaintiff had not exercised due diligence to make the vessel seaworthy prior to and at the commencement of the voyage.[43] Even assuming liability, both plaintiff and defendants disavow some portion of the revised adjustment.

Plaintiff's right to a general average contribution is embodied in the bills of lading, each of which contains the following provision:

> In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper, the consignee, or owner of the goods shall jointly and severally contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salvage ship or ships belonged to strangers.[44]

## DISCUSSION

■ The essence of the ancient maritime doctrine of general average is that " '[w]hat is given, or sacrificed, in time of danger, for the sake of all, is to be replaced by a general contribution on the part of all who have been thereby brought to safety.' "

*Eagle Terminal Tankers, Inc. v. Insurance Co. of U.S.S.R. (Ingosstrakh),* 637 F.2d 890, 892 (2d Cir. 1981) (quoting R. Lowndes & G. Rudolf, *The Law of General Average and the York-Antwerp Rules,* ¶ 1 (10th ed. 1975)). *See also Orient Mid-East Lines, Inc. v. A Shipment of Rice,* 496 F.2d 1032 (5th Cir. 1974), *cert. denied,* 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975) ["*Orient Mid-East*"]; *Bubble Up International Ltd. v. Transpacific Carriers Corp.,* 458 F.Supp. 1100 (S.D.N.Y.1978) ["*Bubble Up*"]; *Cia. Atlantica Pacifica v. Humble Oil & Refining Co.,* 274 F.Supp. 884 (D.Md.1967).[45] The doctrine is commonly incorporated in the contracts of carriage between the vessel owner and the cargo interests. Specifically, since the Supreme Court's decision in *The Jason,* 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1912), vessel owners have normally contracted for such contribution from cargo interests in all cases in which the owner, pursuant to statute, would not be responsible for cargo damage resulting from an accident.[46] Accordingly, the bills of lading in the instant case contain a so-called "New Jason Clause," which provides in effect that unless the vessel would be liable for cargo damage under the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315 ["COGSA"], the owner is entitled to general average contribution from the cargo interests.

Section 4 of COGSA provides that a vessel owner is not liable for cargo damage "arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy," 46 U.S.C. § 1304(1), and that "[n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from ... [l]atent defects not discoverable by due diligence," *id.*

---

**43.** Defendants also advanced this objection at the time of the first adjustment.

**44.** JX 1A; JX 1B; JX 2.

**45.** Disputes involving general average rarely surface in the courtroom, *see* G. Gilmore & C. Black, *The Law of Admiralty* 250–51 (2d ed. 1975), principally because the industry's private resolution procedures in this area are so comprehensive and widely-accepted.

**46.** In *The Jason,* the Supreme Court upheld for the first time the validity of a clause included in bills of lading providing that general average would be payable even if the general average situation arose through the negligence of the ship, as long as the shipowner exercised due diligence to make the ship seaworthy. *See generally* G. Gilmore & C. Black, *supra* note 45, at 266–68.

§ 1304(2)(p).[47] Section 4 also places the burden of proving the exercise of due diligence on the owner. *Id.* § 1304(1). In the instant action, there is no dispute that the breakdown was of a general average nature and that it resulted from the unseaworthiness of the ship. Thus, the issue presented is straightforward—has plaintiff sustained its burden of proving that it exercised due diligence to make the ship seaworthy. "If through lack of due diligence the carrier fails to provide a seaworthy ship, the carrier may not recover in general average for damage proximately caused by the unseaworthiness." *Orient Mid-East, supra,* 496 F.2d at 1037.

What constitutes due diligence has been variously stated by the many courts addressing the issue. This Court adopts the following formulation: "The standard is not merely what ship owners usually do, but what a reasonably prudent one would do—and not what he might do in another vessel but in this vessel under the particular circumstances here present." *California & Hawaiian Sugar Refining Corp. v. Winco Tankers, Inc.,* 278 F.Supp. 648, 654 (E.D.La. 1968) ["*Winco Tankers*"]; *accord, Bubble Up, supra,* 458 F.Supp. at 1108.[48] It is self-evident that the issue is always a factual one, the determination of which is unique to each case. *See Winco Tankers, supra,* 278 F.Supp. at 652. Having carefully considered all the facts and circumstances, the Court finds that plaintiff exercised due diligence herein.

The Court believes it appropriate to determine first what caused the explosion aboard the Hugo Oldendorff before proceeding to determine whether plaintiff exercised due diligence to make the ship seaworthy. The only evidence adduced at trial relating to cause was Mason's survey report and Mason's and Poehlsen's deposition testimony. The report's conclusion, as reinforced by the deposition testimony, that the ultimate cause was a malfunction in the No. 2 lube oil pump brought on by the absence of a set screw and spring clip, went uncontroverted by defendants. Moreover, defendants have failed to articulate a reason why the Court should doubt Mason's expertise or the credibility of either Mason or Poehlsen. In short, there is sufficient credible evidence in the record to support a finding that the breakdown at sea was caused by the malfunction of the No. 2 lube oil pump, as described in Mason's report, and the Court so finds.[49]

---

47. Section 3 of COGSA further provides that "[t]he carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to [m]ake the ship seaworthy [and] properly man, equip, and·supply the ship . . . ." 46 U.S.C. § 1303(1)(a), (b).

48. The *Winco Tankers* test is somewhat more demanding than required by other courts. *See, e.g., Yawata Iron & Steel Co. v. Anthony Shipping Co.,* 396 F.Supp. 619 (S.D.N.Y.1975), aff'd mem., 538 F.2d 317 (2d Cir. 1976) ["*Yawata*"]; *Margarine Verkaufsunion G.m.B.H. v. M.T. G.C. Brovig,* 318 F.Supp. 977 (S.D.N.Y.1970) ["*Margarine*"]. In *Yawata,* Judge Lumbard, sitting by designation, stated: "Due diligence requires that the ship owner take 'normal precautions' to ensure that his ship is seaworthy. It is essentially the same as exercising reasonable or ordinary care." 396 F.Supp. at 627 n.10 (quoting *Peter Paul, Inc. v. Rederi A/B Pulp,* 258 F.2d 901, 905–06 (2d Cir. 1958)) (citation omitted). In *Margarine,* Judge Weinfeld stated that due diligence requires a "reasonable and customary test or inspection." 318 F.Supp. at 982.

49. Defendants argue that because particles small enough to pass through 100 micron filters must necessarily be smaller than .1 millimeters in diameter, the scoring and grooving on the main crankshaft bearings, which was found to be one millimeter in depth, could not have been caused by particles from the lube oil pump. Defendants have not, however, adduced any evidence to support this contention, and did not challenge the conclusions of Mason and Poehlsen on cross-examination. In the face of the testimony and findings of these two experienced marine surveyors and engineers, the Court is unwilling to conclude that the damage was not caused in this fashion, especially in light of the manner in which they carried out their examination of the engine. *See* note 18 *supra.*

Defendants also contend that the No. 2 lube oil pump was in service after the accident, either between New Orleans and Algiers or between Algiers and Amsterdam, based (1) on the fact that that pump was operating at the time of the engine failure, and (2) on Hanselmann's testimony that he changed from one pump to the other at every port. *See* Hanselmann Deposition at 11. Defendants apparently

Defendants focus their arguments on Poehlsen's statement that the pump malfunction was due to repairers' negligence in failing to reassemble the pump properly after the German Lloyd overhaul in 1973. Defendants contend that the shipowner is responsible for such conduct, see The Muncaster Castle, [1961] A.C. 807, 1 Lloyd's List L.R. 57, and thus could not have exercised due diligence to make the ship seaworthy. Plaintiff responds that Poehlsen's comments, although made in good faith, are belied by the evidence. The Court agrees with plaintiff.

Poehlsen characterized his statement as a guess based solely on the 1973 German Lloyd survey report. The evidence established, however, that although an inspector may on occasion order a lube oil pump opened and disassembled, it is unlikely that this occurred during the 1973 survey. The report itself makes no mention of the pump being disassembled, and Vanhoucke, the Antwerp shipyard representative, testified that no repairs were made on either of the two pumps while the vessel was in the yard. Vanhoucke also testified, as did Jensen and Hanselmann, that such pumps would not normally be opened during a German Lloyd classification survey of the type performed on the Hugo Oldendorff in 1973. Moreover, Mason, Poehlsen, Hanselmann and Jensen testified that as long as this type of pump shows no external signs of malfunction, it requires no maintenance, and Jensen and Vanhoucke testified that absent signs of malfunction, it would be imprudent to open the pump and inspect it internally. Thus, it is far more probable that rather than dismantling the pump, the German Lloyd surveyor inspected it from the outside, and then, after asking the ship's engineer to

start it, listened for unusual noises and checked for pressures. In light of the foregoing, the Court finds that the missing set screw and spring clip, which led to the loosening of the locking nut and ultimately caused the explosion, cannot be attributed to repairers' negligence. The pump was most probably never opened after it was manufactured and installed aboard the Hugo Oldendorff in 1969.

Turning to the issue of due diligence, the Court notes the following: The No. 2 lube oil pump aboard the Hugo Oldendorff did not require regular maintenance because it was self-lubricating. Hanselmann, the ship's chief engineer, observed no external signs of malfunction in the several months prior to the breakdown and the previous chief engineer reported no problems with the pump to him. Regular inspections of the vessel were carried out in 1973 and 1975 by a reputable classification society, during which it was not necessary or appropriate to open and disassemble the lube oil pumps unless (1) the ship's engineers reported that the pumps were operating improperly and (2) the inspector, upon external examination, found evidence of malfunction. Finally, Vanhoucke testified that in his thirty-five years in the ship repair industry he had never encountered a similar malfunction of a lube oil pump;[50] Poehlsen likewise had never come across such an occurrence;[51] and Jensen had never seen or heard of a similar case.[52]

■ The Court recognizes that certification by a classification society and the appointment of competent people to inspect or repair the vessel do not, by themselves, satisfy the shipowner's obligation of due diligence. See In re Ta Chi Navigation

further contend that Mason's conclusions as to the cause of the breakdown are inconsistent with the fact that no pump trouble was observed on these subsequent voyages. Again, however, defendants adduced no evidence to support their contentions on this point and did not controvert or undermine the testimony of Mason or Poehlsen or Mason's report. In light of that testimony and report, the Court is unwilling to conclude that the No. 2 pump was in fact in use after the accident. Even if it was in

use, defendants adduced no evidence to indicate that the malfunction could or should have been detected, or that the pump was in use long enough to cause the engine to break down again.

50. Vanhoucke Deposition at 6.

51. Poehlsen Deposition at 19.

52. Tr. at 26.

*(Panama) Corp.*, 504 F.Supp. 209, 230 (S.D. N.Y.1980); *In re Thebes Shipping Inc.*, 486 F.Supp. 436, 458 (S.D.N.Y.1980); The Muncaster Castle, *supra*, [1961] A.C. 807, 1 Lloyd's List L.R. 57. Nevertheless, the fact that the vessel was regularly inspected in conformance with German Lloyd's requirements is probative on the issue of due diligence because a reasonably prudent shipowner would have had the vessel inspected in the same manner.

■ In the face of this evidence, defendants adduced no evidence to indicate that plaintiff did not exercise due diligence. Most important, no expert witnesses testified on defendants' behalf that had shipowner or its servants exercised due diligence, the defect in the No. 2 lube oil pump would have been detected. Instead, defendants speculate that the set screw and spring clip may not have been missing since the time of manufacture and that the pump may have been opened prior to the survey in Amsterdam in 1976. They also argue that because inspectors could have opened the pump prior to the casualty, the failure to detect the missing parts amounted to a failure to exercise due diligence. In effect, defendants contend that plaintiff has *not* proved with certainty that (1) the missing parts ultimately led to the breakdown, (2) even if this was the cause, the parts had been missing since manufacture, and (3) the pump was never and should never have been opened prior to the casualty.

Defendants misapprehend plaintiff's burden of proof. Plaintiff must prove due diligence to make the ship seaworthy by a preponderance of the credible evidence, not to an absolute certainty. *See Peter Paul, Inc. v. Rederi A/B Pulp*, 258 F.2d 901, 905–06 (2d Cir. 1958). As noted above, plaintiff's evidence on this point was credible and uncontroverted. Having considered all the evidence, the Court finds that it is more likely so than not so that the cause of the damage was a defect that was not detected despite the performance of ordinary and appropriate maintenance procedures by the crew of the Hugo Oldendorff, and despite the normal and customary inspections carried out by the ship's crew and the German Lloyd inspectors. Thus, the shipowner could not have taken measures to prevent a casualty it could not have anticipated. In short, "[w]hat more could [have been] done?" *Eastern Marine & Fire Insurance Co. v. S.S. Columbia*, 411 F.Supp. 926, 929 (S.D.N.Y.), *aff'd mem.*, 551 F.2d 299 (2d Cir. 1976). The Court finds that plaintiff has sustained its burden of proving that it did what a reasonably prudent shipowner would do under the circumstances of this case. *See Winco Tankers, supra*, 278 F.Supp. at 654.

## CONCLUSION

In accordance with the foregoing, after a nonjury trial on the merits of plaintiff's complaint, the Court finds for plaintiff. This action is referred to Magistrate Washington for a determination of the accuracy of the general average adjustments.

The foregoing constitute the Court's findings of fact and conclusions of law. Fed.R. Civ.P. 52(a).

SO ORDERED.