**In the Matter of the Complaint of BALLARD SHIPPING CO. for Exoneration from or Limitation of Liability.**

**Civ. A. No. 89–0685L.**

United States District Court,
D. Rhode Island.

Jan. 20, 1993.

---

Thomas H. Walsh, Jr., John J. Finn, Bing-
ham, Dana & Gould, Boston, MA, Gordon P.

Cleary, Vetter & White, Providence, RI, for Ballard Shipping.

Stephen V. Rible, Bigham Englar Jones & Houston, New York City, Richard J. Corley, Providence, RI, for Americas Ins. Co.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on the motion of Ballard Shipping Co. ("Ballard") for summary judgment against claimant Americas Insurance Company ("Americas") pursuant to Rule 56 of the Federal Rules of Civil Procedure. Americas, which is seeking payment from Ballard for the value of cargo destroyed in a shipping accident, argues that Ballard's motion must be denied because genuine disputes exist regarding facts material to the outcome of the case.

The present motion is one of many arising from the June 23, 1989 grounding of the vessel M/V WORLD PRODIGY off the coast of Rhode Island. As a result of that accident, the ship spilled a large quantity of its cargo of oil into Narragansett Bay. Soon after the spill, several suits were filed against Ballard, the owner of the M/V WORLD PRODIGY, thus prompting Ballard to file a verified complaint for exoneration from or limitation of liability under 46 U.S.C.App. § 183 in this Court in December, 1989. Americas, the insurer of the cargo of oil aboard the M/V WORLD PRODIGY at the time of the vessel's accident, reimbursed the cargo owners for the value of the cargo lost. Americas then filed a claim against Ballard pursuant to its subrogation rights to recover monies paid to the cargo owners.[1]

## BACKGROUND

At the time of the casualty, the WORLD PRODIGY was a three year old Greek-flag tanker, owned by Ballard and managed and operated by Ballard's agent, International Operations, S.A. ("International Operations"). The vessel was under the command of Captain Iakovos Georgudis, who had served as a seaman for twenty-three years, including more than 18 years as a licensed deck officer, and had been licensed by the Greek government to act as master of merchant vessels for over eight years. Assisting Captain Georgudis were Chief Officer George Vlachos, who had seven years of sea-going experience, and Second Officer Dimitrios Mitaras, who was licensed by the Greek government to serve as a Second Officer and had been employed by International Operations for nine years.

The WORLD PRODIGY departed on its ultimately doomed voyage from Piraeus, Greece, on June 10, 1989 carrying a cargo of oil bound for the United States. On June 21, 1989, while at sea, Captain Georgudis learned that his destination was Providence. Bad weather impaired visibility the day and night before the ship was set to arrive in Providence, and Captain Georgudis spent most of June 22–23, until the grounding, on the bridge of the vessel. Nonetheless, visibility had improved and the seas were calm by the time the boat approached Narragansett Bay in the afternoon of June 23rd. Before entering the Bay, Captain Georgudis plotted the ship's intended course on British Admiralty ("BA") chart 2890 and planned to pick up a pilot in the vicinity of Brenton Reef Light Tower. However, before the vessel reached the anticipated boarding area, it strayed off course, passing a red buoy on the starboard rather than port side. At about 4:40 p.m., the WORLD PRODIGY hit Brenton Reef, spilling almost 300,000 gallons of oil into the Bay, thus spawning numerous suits, including the present one.

Americas's claim for payment in this action is governed by the Carriage Of Goods By Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300–1315 (1992). Ballard argues that the grounding of the WORLD PRODIGY resulted solely from the master's negligent navigation and ship management, thus exempting Ballard from liability under COGSA. Americas responds that facts regarding the underlying cause of the accident are in dispute, and that a trial is necessary to determine the role Ballard played in the loss of the cargo.

---

1. Additional procedural background is set forth in *In re Complaint of Ballard Shipping Co.*, 752 F.Supp. 546, 547 (D.R.I.1990) and *In re Complaint of Ballard Shipping Co.*, 772 F.Supp. 721 (D.R.I.1991).

After hearing oral arguments on this motion, the Court took the matter under advisement. It is now in order for decision. For the reasons that follow, the Court denies Ballard's motion for summary judgment.

## DISCUSSION

### I. *Summary Judgment Standard*

■■■ Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A fact is material if it could affect the outcome of the suit. *Ryan, Klimek, Ryan Partnership v. Royal Ins. Co. of America,* 728 F.Supp. 862, 866 (D.R.I.), *aff'd,* 916 F.2d 731 (1st Cir.1990). Further, in determining whether summary judgment is appropriate, the court must view the facts in the record and all inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991). Additionally, the moving party bears the burden of showing that no evidence supports the non-moving party's position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The party opposing summary judgment need only show that there are questions of fact which must be resolved before the Court can decide the related legal issues. *Mack v. Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). Since this Court concludes that genuine disputes over material facts prevent it from determining the legal issues at this juncture in the present case, the Court must deny Ballard's motion for summary judgment.

### II. *Carriage Of Goods By Sea Act*

■■ Americas filed a claim seeking payment from Ballard for the value of the cargo lost after the M/V WORLD PRODIGY hit Brenton Reef. Both parties agree that COGSA governs the present claim. COGSA, like its predecessor the Harter Act of 1893, allocates the risk of cargo loss from various perils of the sea between the shipowners (or "carriers") and the cargo owners (or "shippers").[2] The Act requires carriers to exercise due diligence to make their vessels seaworthy. 46 U.S.C.App. § 1303(1). However, to balance the interests of the parties involved in commerce on the high seas, COGSA exempts shipowners from liability for both cargo losses due to the vessel's unseaworthiness if the carrier had exercised due diligence to ensure the ship's readiness prior to the start of the voyage, 46 U.S.C.App. § 1304(1), and cargo losses resulting from certain specified actions beyond the carrier's control, 46 U.S.C.App. § 1304(2).

■■■ Turning to the specifics of an action under COGSA, in order for a shipper's claim to succeed, the shipper must first establish that its cargo was lost or damaged while in the carrier's custody. *See* 46 U.S.C.App. § 1303; *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 351–52 (2d Cir. 1981). If the shipper makes out this *prima facie* case, the carrier must prove that the grounding of the ship resulted from one of the perils for which carriers are specifically exempted under COGSA. *See* 46 U.S.C.App. § 1304(2); *M. Golodetz Export Corp. v. S/S LAKE ANJA,* 751 F.2d 1103, 1110 (2d Cir.), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985). The burden then shifts back to the cargo owner to show that the

---

**2.** Historically, general principles of maritime law held the carrier strictly liable for cargo damage or loss in all cases except accidents from act of God, act of public enemies, shipper's fault, or inherent vice of the goods. Michael F. Sturley, "Basic Cargo Damage Law: Historical Background," in 2A *Benedict on Admiralty* 2–1 (1992). Such no-fault liability led to bills of lading in which the carrier contracted out of liability for virtually all losses. *Id.* at 2–2. Congress, in The Harter Act and later in COGSA, reacted to the growing imbalance, *id.* at 2–2 to 2–23, and attempted "to achieve a fair balancing of the interests of the carrier, on the one hand, and the shipper, on the other...." *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer,* 422 F.2d 7 (2d Cir.1969), *cert. denied sub nom. Universal Marine Corp. v. Encyclopaedia Britannica, Inc.,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970).

vessel was unseaworthy and that such unseaworthiness was a concurring cause of the accident. *See Director General of India Supply Mission v. S.S. MARU,* 459 F.2d 1370, 1372 (2d Cir.1972), *cert. denied,* 409 U.S. 1115, 93 S.Ct. 898, 34 L.Ed.2d 699 (1973). Although seaworthiness does not require perfection, a shipper can demonstrate unseaworthiness if it shows that the vessel was not strong, not well equipped for the intended voyage, or not manned with competent officers and crew. *The Propeller Niagara v. Cordes,* 62 U.S. 7, 23, 16 L.Ed. 41 (1858). If the shipper reveals that unseaworthiness caused the vessel to ground, its claim will succeed unless the carrier can prove that, despite the unseaworthiness, the carrier exercised due diligence in preparing the ship for its voyage. *See* 46 U.S.C.App. §§ 1303(1), 1304(1);[3] *Yawata Iron & Steel Co. v. Anthony Shipping Co.,* 396 F.Supp. 619, 621 (S.D.N.Y.1975), *aff'd,* 538 F.2d 317 (2d Cir.1976).

For the purposes of this motion, Ballard concedes that Americas has established a *prima facie* case that cargo was lost while in Ballard's custody. Ballard argues, however, that the evidence shows, without question, that the accident was solely the fault of the master's navigation and management, one of the several enumerated perils of the sea for which a carrier is exempt from liability under COGSA, 46 U.S.C.App. § 1304(2).[4] Ballard also contends that the facts demonstrate that

it exercised due diligence in preparing the ship for its voyage. Americas counters, first, that the facts concerning the master's alleged negligence are still contested. Second, Americas claims that, even if the master's negligence contributed to the grounding, factual disputes exist as to whether the ship was unseaworthy; whether such unseaworthiness, if any, stemmed from a lack of due diligence on Ballard's part in preparing the ship for sea; and whether such unseaworthiness due to lack of due diligence by Ballard, if any, contributed to the casualty in Narragansett Bay.

### III. *Concurring Causes Attributable to Ballard*

The Court concludes that, at this stage, Americas has not raised any facts to counter Ballard's strong evidence that Captain Georgudis was negligent. However, there is some evidence suggesting that Ballard contributed to the grounding by creating conditions, such as fatigue of the master and the absence of a dedicated lookout, that rendered the ship unseaworthy. Ballard denies responsibility, insisting that the facts reveal, without doubt, that all of the alleged contributing causes fall within the master's dominion over the navigation and management of the ship. However, after analyzing the evidence presented to this point in the proceedings, the Court concludes that factual dis-

---

3. COGSA places the burden of exercising due diligence to ensure the seaworthiness of the ship on the carrier. Specifically, 46 U.S.C.App. § 1303(1) requires:

    The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—
    (a) Make the ship seaworthy;
    (b) Properly man, equip, and supply the ship....
    Further, COGSA, 46 U.S.C.App. § 1304(1), provides:
    Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied.... Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

4. COGSA provides, in relevant part:

    (2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
    (a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;
    ...
    (c) Perils, dangers, and accidents of the sea or other navigable waters; ...
    (q) Any other fault arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.
    46 U.S.C.App. § 1304(2).

putes exist regarding the relationship between Ballard's actions and the loss of the cargo. Because the facts concerning whether Ballard's actions contributed to the unseaworthiness of the ship are in dispute, the Court cannot yet determine whether Ballard exercised due diligence in preparing the WORLD PRODIGY for its voyage.

### A. *Fatigue*

■ First, the Court infers from the materials in the record that fatigue likely played a role in the grounding.[5] There is evidence that at the time of the accident, when the ship was performing the delicate task of entering the Bay, the master had been awake and on the bridge for over thirty consecutive hours, except for trips below to get coffee or telexes and a 15 minute interval during which he rested on a cot on the bridge.

Ballard argues that avoiding personal fatigue is within the master's management responsibility, and cannot be attributed to the carrier unless such fatigue was caused by an unseaworthy condition existing at the commencement of the voyage. *See Wilbur–Ellis Co. v. M/V CAPTAYANNIS S*, 306 F.Supp. 866, 869–70 (D.Or.1969), *aff'd*, 451 F.2d 973 (9th Cir.1971). Arguing that no unseaworthy conditions existed, Ballard insists that COGSA immunizes it from ramifications of any fatigue experienced by the master. However, as discussed below, Ballard's reasoning ignores evidence suggesting that improper instructions may have rendered the ship unseaworthy and caused Captain Georgudis's fatigue.

Importantly, Americas has presented enough evidence to raise a dispute as to whether the master's fatigue can be visited on the ship owner. Americas points to the manual ("Tanker Manual") supplied to the WORLD PRODIGY by International Operations as providing improper instructions which rendered the vessel unseaworthy. *See In re THE DENALI*, 105 F.2d 413 (9th Cir.1939) (owner responsible for navigating officer's fatigue where owner's agent improp-

erly altered instructions regarding the correct watch standing procedures), *aff'd on rehearing*, 112 F.2d 952, *cert. denied sub nom Alaska S.S. Co. v. Pacific Coast Coal Co.*, 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444 (1940). The Tanker Manual instructs:

> 2. The Master will be present on the bridge on the following occasions:
>> (a) entering and leaving port;
>> (b) docking and undocking;
>> (c) shifting ship;
>> (d) in close and restricted waters;
>> (e) in reduced visibility;
>> (f) when passing through canals.
>
> It must, however, be clearly understood that the Master will personally direct navigation whenever he considers that circumstances demand his presence on the bridge.

The Court notes that these instructions differ from ones found in the International Chamber of Shipping, "Bridge Procedure Guide" (the "ICS Guide"). The ICS Guide explicitly states, "The Officer of the Watch continues to be responsible for the safe navigation of the vessel despite the presence of the Master on the bridge until the Master informs him specifically that he has assumed responsibility." Americas argues that the Tanker Manual improperly requires the Master to maintain the conn, i.e. control the navigation, even when another officer has the watch. Further, Americas claims that Captain Georgudis became fatigued because, rather than follow the ICS Guide and allow the officer of the watch to maintain the conn, he complied with the Tanker Manual. Thus Americas claims, because the circumstances, including reduced visibility and entering a port, "demand[ed] his presence on the bridge," Captain Georgudis had been conning the vessel for over thirty hours when the stranding occurred.

In addition to the differences between the manuals, Americas supports its thesis with testimony suggesting both that Captain Georgudis did maintain the conn virtually the

---

**5.** The court makes this determination without any reliance on the National Transportation Safety Board report, and thus finds no reason to rule on the admissibility of this report at this time. If a ruling on the report's admissibility becomes necessary, one will be made at the time of trial.

x

74

entire thirty plus hours he was on the bridge just prior to the casualty and that the Chief Officer understood that the master maintained the conn whenever the master was on the bridge. Further, even though International Operations supplied the WORLD PRODIGY with an ICS Guide, Americas has presented evidence suggesting that the Tanker Manual was never countermanded and that Captain Georgudis did not sign the ICS Guide as required to indicate that he had read it. The Court concludes that these facts, combined with other evidence in the record, raise a number of related genuine factual disputes, including whether the Tanker Manual required the master to maintain the conn whenever "circumstances demand[ed] his presence on the bridge"; whether such an interpretation would render the instructions improper; and whether such instructions contributed to the master's fatigue in this case.

B. *Adequacy of Lookouts*

■ Similarly, the Court concludes that facts regarding the absence of a lookout aboard the WORLD PRODIGY as the vessel entered Narragansett Bay preparatory to entering the port of Providence remain disputed. The record, viewed in the light most favorable to Americas, could support Americas's theory that the absence of a trained lookout made the ship unseaworthy and contributed to the grounding, and that Ballard should bear the responsibility for failing to adequately train its crewmembers and neglecting to instruct the vessel's master to assign a trained person, unincumbered by other duties, to act as lookout.

Ballard concedes that no crew member had been assigned to act as a dedicated lookout on the WORLD PRODIGY while the vessel attempted to maneuver into the Bay. At the time of the casualty, the boatswain who was stationed on the bow was responsible for releasing the anchor, while a second seaman who had been acting as lookout had been dispatched from the bridge to prepare the ladder for the pilot's anticipated arrival. In fact, there is some evidence suggesting that it was standard practice on the WORLD PRODIGY to assign multiple tasks to seamen acting as lookouts. Additionally, it is clear that International Operations did not specifically train its crew members on how to act as a lookout nor explicitly instruct its captains to post a lookout with no other duties.[6]

The Court finds that the evidence in the record could support a conclusion that the absence of a trained dedicated lookout contributed to the stranding.[7] For instance, nobody ever notified the master that there were red marker buoys ahead of the vessel or warned him that the ship was improperly passing a red buoy, which should be to the starboard of a vessel coming from sea, on the ship's port side.

The more controversial question, again, is whether Ballard should bear liability for the WORLD PRODIGY's failure to have a trained person who had no other responsibilities acting as a lookout. Ballard argues that posting a lookout, like avoiding fatigue, falls within the master's management of the vessel, unless caused by an unseaworthy condition, such as undermanning, which Americas does not allege here. *See In re Complaint of B.F.T. No. Two Corp.*, 433 F.Supp. 854, 866–67 (E.D.Pa.1977) (in context of petition for Limitation of Liability, failure to maintain a lookout without any other duties was not due to undermanning, but rather, constituted an error in navigation). Thus, Ballard contends, COGSA immunizes the carrier from liability for this management mistake by the master. 46 U.S.C.App. § 1304(2).

6. While the Tanker Manual explicitly instructed the watch officers to "post the necessary lookouts" when visibility is limited by fog, mist, snow or heavy rain, it mentions nothing about posting a lookout while entering a port or assigning no other duties to a seaman posted as lookout.

7. If the Court finds that the failure to post a dedicated lookout in this situation violated a statute requiring ships to post proper lookouts, 33 U.S.C. § 1602, Rule 5, then the Pennsylvania Rule applies. *The Pennsylvania*, 86 U.S. 125, 136, 22 L.Ed. 148 (1873); *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1160 (2d Cir. 1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). The Pennsylvania Rule places the burden of proving that the violation, in this case the failure to post a lookout, could not have been one of the causes of the damage. *Id.*

However, Americas argues that Ballard created unseaworthy conditions by failing to train its seamen how to act as lookouts, by allowing the practice of assigning additional tasks to seamen acting as lookouts to become a standard practice, and by failing to instruct ship masters to post seaman to act exclusively as lookouts. Americas cites a regulation and numerous cases in support of its argument that Ballard is ultimately responsible for the absence of a trained dedicated lookout in this case. For example, 33 U.S.C. § 1602, Rule 5, requires vessels to have proper lookouts,[8] and courts have deemed lookouts hampered by additional duties improper. *See, e.g., In re Complaint of Delphinus Maritima, S.A.*, 523 F.Supp. 583, 593–94 (S.D.N.Y.1981) (absence of a lookout with no other duties was one reason vessel found unseaworthy); *In re Complaint of Flota Mercante Grancolombiana, S.A.*, 440 F.Supp. 704, 715–16 (S.D.N.Y.) (lookouts on vessels must have no other duties to perform and must be suitably experienced, properly stationed, and vigilantly employed in performance of that duty), *aff'd*, 573 F.2d 1290 (2d Cir.1977). Courts have also faulted the carrier for failing to train the crew regarding their duties as lookouts, *see, e.g., In re Complaint of Hercules Carriers, Inc.*, 768 F.2d 1558, 1576–77 (11th Cir.1985) (failure of carrier to train crew on how to carry out duty as lookout directly attributable to carrier); found that an ongoing practice in violation of a statute rendered a vessel unseaworthy, *see e.g., Delphinus Maritima*, 523 F.Supp. at 595 (ongoing practice of not having lookout contributed to unseaworthiness of vessel); and determined that the failure to instruct the captain to post a lookout with no other duties whenever the vessel entered a harbor was attributable to the carrier, *see, e.g., In re Complaint of Hercules Carriers, Inc.*, 566 F.Supp. 962, 981 (M.D.Fla.1983) (in limitation of liability action, carrier denied limitation in part because failed to properly instruct crew regarding posting lookouts), *aff'd*, 768 F.2d 1558.

After reviewing the facts in the record, the Court concludes that there is enough evidence to raise a dispute regarding whether or not Ballard provided adequate training and instructions to comply with the regulation to render the ship seaworthy in this instance. By this determination, however, the Court is not deciding whether or not the carrier has an absolute affirmative duty to train crewmen how to act as lookouts or instruct masters exactly when to post lookouts in order for a ship to be seaworthy; a determination of the seaworthiness of a ship is fact specific and depends on the circumstances of the vessel's voyage. *The Southwark*, 191 U.S. 1, 8–9, 24 S.Ct. 1, 3, 48 L.Ed. 65 (1903). Therefore, rather than decide this matter in a vacuum, the Court will reserve reaching a conclusion until it can consider all the facts adduced at trial.

### C. Navigation Charts

■ The parties also disagree about the facts surrounding the charts Captain Georgudis utilized to navigate in Narragansett Bay. Clearly the chart on which he actually plotted his intended course was BA chart 2890. However, questions remain regarding whether this chart was inadequate and whether Ballard can be held responsible for Captain Georgudis's reliance on this chart.

Although Ballard concedes that BA chart 2890 was a small scale chart which indicated only one of the three red buoys marking the entrance to the Bay, it argues that the chart did not contribute to the grounding. Ballard explains that Captain Georgudis had plotted the correct course on BA chart 2890, but failed to follow the course he had plotted. Additionally, the buoy that the vessel missed was the one that appeared on the chart. Therefore, Ballard concludes, since Georgudis knew from BA chart 2890 where the ship was supposed to go, a chart indicating three buoys would not have provided any additional assistance.

Nonetheless, the Court believes that such a conclusion is not necessarily supported by

---

**8.** Rule 5 of 33 U.S.C. § 1602 states, "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."

the facts presently in the record. First, although using British charts equivalent to United States charts for navigation in United States waters is acceptable, 33 C.F.R. § 164.-33(b) (permitting substitution of foreign charts and publications for U.S. equivalent), BA chart 2890 was not equivalent to current United States charts. Rather, Captain Georgudis used a chart indicating only one red buoy needed to be kept to the starboard side of the vessel, and Georgudis kept one red buoy to that side. At a minimum, the Court, viewing the evidence in the light most favorable to Americas, can draw an inference that the master's failure to use a chart indicating that the vessel needed to keep two red buoys to the starboard side might have contributed to the accident.

Ballard also contends that, even if the Court finds that BA chart 2890 may have contributed to the casualty, Captain Georgudis chose to rely on the small scale British chart rather than on other British and American charts aboard the WORLD PRODIGY depicting Narragansett Bay. Ballard claims that the charts on board were properly updated, and explains that BA chart 2890 indicated only one buoy because it was drawn on a small scale. It thus argues that Captain Georgudis's decision was an error in navigation, not a sign of unseaworthiness.

However, the Court concludes that both the facts Ballard relies on and the conclusion Ballard reaches are still in dispute. Importantly, Americas has presented at least some evidence suggesting that the charts aboard the WORLD PRODIGY were not properly updated. Further, it is not clear that Captain Georgudis's decision to use BA Chart 2890 was entirely his own. There is some evidence suggesting that Ballard's agent, International Operations, through a policy of favoring British Charts, by forcing captains who wanted supplemental United States charts to purchase the charts themselves, and by not providing adequately updated United States charts, may have exerted undue pressure on Captain Georgudis to use BA Chart 2890. A trial is necessary to sort out the facts.

### D. *Other Disputed Issues*

In addition to these three factual issues, Americas raises questions regarding the WORLD PRODIGY's Loran C; the effect of telexes sent to Captain Georgudis by Ballard's agents; the effect of instructions in the Tanker Manual regarding speedy dispatch in port; and the effect of the crew's conduct after the grounding on the amount of oil lost. As the Court has already determined that summary judgment is inappropriate on the basis of disputes concerning other material facts, it will wait until the facts are more fully developed at trial to discuss the merits of Americas's additional arguments.

### CONCLUSION

Finding genuine disputes as to facts material to the outcome of the case, the Court hereby denies Ballard's motion for summary judgment.

*It is so Ordered.*